Good morning, your honors. May it please the court, my name is Isaac Schweiger. I represent plaintiff appellants Travis King and Brianna Raimundo. I would ask to reserve five minutes for rebuttal, please. This case comes before your honors on the granting of summary judgment by the district court. The plaintiff's position is that the district court erred in granting summary judgment for the defendant appellees. The district court resolved all factual disputes in favor of the defendants, drew every inference in favor of the defendants. No, no, no. The district court did not resolve factual disputes as if there were any. Thank you, your honor. That's a different matter. Yes, I believe your honor has put it better. And, in fact, this case probably presents a sea of factual disputes. We believe the district court ignored the bulk of the factual record. The court accepted the defendant's self-serving statements wholesale, disregarded any internal contradictions thereto, and failed to apply the Hudson factors at all. This court should reverse. The standard of review is de novo. As a threshold matter, this case falls squarely under the umbrella of Scott v. Heinrich or Gonzalez or Cruz v. City of Anaheim. Those cases were deadly force cases where there was no surviving plaintiff to tell his side of the story. And owing to Mr. King's catastrophic brain injury here, he possesses no memory of the events which gave rise to this lawsuit. And even if he did, he is largely incapable of communicating in any reasonable way. If the court did review the video deposition of Mr. King, you would see that his responses and deposition were largely incoherent and limited to one or two word replies. As such, the court should not, and the district court should not have, simply accepted the self-serving accounts of those defendants who used force on Mr. King. Well, but counsel, there's a difference between saying that the district court just simply accepted what they said as opposed to the district court. And I think the district court tried very hard to get counsel for the plaintiff to identify for him where exactly in the record disputed issues of fact were established. So I don't think the district court just willy-nilly took inferences in their favor. I mean, he spent a lot of time trying to get counsel, I can't remember whether it was you or someone else, to identify in the record where there were specific factual disputes that support your view. So I think you should get to where in the record they are, because I have the same exact questions Judge Chabria had. It was me, Your Honor, that was at oral argument and summary judgment. As the court is well aware, the factual record in this matter is quite voluminous, which- Including videos. Including videos. But no videos from what happened in the room while the door was closed. That is correct, Your Honor. Owing to that, it's unfortunately highly impractical to be able to commit, say, to instant recall and memory- Step closer to the microphone, your voice is dropping down. I beg your pardon, Your Honor. Owing to the voluminous nature of the record, it's impractical to have instant recall, say, from memory, of every pinpoint citation to the record, which is why- Right, that's why the judge took a recess. Yes, Your Honor. It's also why plaintiffs provided a pretty extensive briefing on this matter with those citations in our briefing. And to the extent, as I mentioned, that the court disregarded and did not bother to apply the Hudson factors in this case, it's difficult to tell to what extent that record that was provided was actually examined. In fact, I'm quite certain that nowhere in the district court's order was the case of Hudson even mentioned, let alone the Hudson factors. But as you say, our review is de novo. Yes, it is, Your Honor. And so I think it would probably be most expeditious to jump to those Hudson factors and explain why the district court erred and why this court should, in fact, reverse. As Your Honors well know, the Hudson factors are designed to determine whether or not there was a constitutional injury under the purpose-to-harm standard, the key inquiry being whether or not the force was used in a good-faith effort to restore order or discipline or whether it was used maliciously or sadistically for the very purpose of causing harm. Those five factors, number one, the extent of the injury. I will take these in turn if it pleases the court. Here, Mr. King's injuries are perhaps the most profound injuries that a human being can suffer and not die. That is not disputed by any defendant in this matter. So that factor definitely tilts in favor of a finding. Two is the need for the application of force. Now, in this particular matter, that need is disputed, but it goes beyond a single. Well, you dispute it, but that doesn't mean there are disputed facts. There's no question that even in the light most favorable to you, your client was trying to escape, right? I beg your pardon, Your Honor? I said there's no dispute that your client was trying to escape from custody, is there? There is such a dispute, Your Honor. Well, what facts point to that? I've looked at the depositions. I've looked at the video. Your client bolted from the room, right? Yes, that is correct, Your Honor. Okay. And at that point, the officers had a duty to prevent him from further bolting, right? That is correct. Okay. Go ahead. As far as whether he was escaping, perhaps one of the most compelling pieces of evidence that he was not was that for a full 40 minutes when my client was in the room alone with a much smaller individual, a single guard, and let out of his restraints so that he could use the restroom, at no time did he decide to flee. But how does that inform the question of the situation facing the officers when your client bolted from the room? Well, the officers absolutely had a duty, even if, let's say, I'm assuming for argument's sake, that they had done something inappropriate that caused my client to flee the room. And we don't know. We simply do not know. Well, there are no facts that illustrate that that happened. But, as you say, even if one assumed for the sake of argument that something that we don't know about happened in the room, he bolted and they had a duty to stop him. That is correct, Your Honor. Your Honor is absolutely correct. And that is why we detailed in our brief that to the extent there was a need for the application of force at the outset, and I'll submit for purposes of this argument, despite there being, I believe, significant dispute as to what occurred in the room or did not, for purposes of this argument, the court doesn't have to decide what happened in the room. The court needs to decide if the need for the use of force changed once Mr. King was in four-point restraints. And in this case, we argue that it does. This was when the doctor was injecting him. It was quite before that, I believe, Your Honor. Okay, so they stopped him from escaping, and then the doctor injected him. At some time after that. As the court saw in the video, Mr. King was taken down to the ground within seconds of breaching the hospital room door. So he's down on the ground under the weight of at least one correctional officer and being pinned to the ground. Within seconds, his leg irons are reapplied. Now, of course, the defendants offer a story that he broke free of his leg irons, and that's how he was able to escape the room. That's not believable under any set of circumstances. But they reapplied those leg irons within seconds. So within seconds, he was on the ground under the weight of at least one officer with his leg irons reapplied. Within two minutes, and this is based on the testimony of these defendants, within two minutes, he was also handcuffed. At that point, he was in four-point restraints under the weight of at least one and now approaching two officers. We have one officer who says that he's kneeling on his back, another saying he's kneeling below his shoulders, and they're holding him down to the ground. Sergeant Dews additionally states that he is pressing on the back of Mr. King's, below his neck, at the base of his neck at a shoulder blaze with his forearm and holds him in that position until he actually gets up. So when Dr. Dittmar testified that he felt that even though this restraint was ongoing, as you described, that he felt the need to inject your client, he testified, yes, I felt that both he and the staff were in an unsafe situation, and he had previously referred to it as an emergency situation. And he's referring to post your description. He may well be, Your Honor, yes. But I don't think that changes. The fact that it is an emergency, as described by a civilian, does not change that from a law enforcement perspective, the force paradigm has changed. If he was attempting to escape, as defendants claim, then regulations at the time would have permitted the use of deadly force to prohibit his escape. But I believe this court would agree that once a man is in four-point restraints on the ground under the weight of restraining officers, deadly force is no longer authorized. I'm sorry. No, no. Please go ahead. Do you agree that the record shows that as your client's struggling sort of ceased, that the officers eased up their use of force? No. I believe that you only find that in the statements of the defendants themselves. Not in the video. No, Your Honor. But we can judge the video for ourselves. And I think the court should. And, in fact, I believe the court may be required to under the Supreme Court's precedent, Scott. So, counsel, what is your best case for in the facts here, other than at a high level of generality, which the Supreme Court tells us we can't use, that would have put the officers on notice at the point where they're outside the room, when you say the leg irons, et cetera, that they could not continue the restraints they were continuing for the period of time between that time and when the doctor injected your client? What case best puts them on notice, in your view, other than at a high level of generality? So I'll answer this in a, forgive me, Your Honor, in a slightly circuitous way. I hope to do my best to provide this to the court. In our briefing to the district court, we did focus somewhat on Drummond. Drummond is a Fourth Amendment case, and the distinction is important. However, that doesn't mean that it's not informative to what's going on here. In Drummond, this court stated unequivocally that the prolonged use of weight on the back in a prone, restrained individual may constitute deadly force. And Drummond cited to not just other cases that have appeared on the court, but Drummond cited to things like the training that the officers had put them on notice, or that news media of restrained dress and prone individuals put them on notice. So there's a combination of things going on here, Your Honor. I don't have an Eighth Amendment case other than the broad general descriptions provided in Hudson and in Whitley and their progeny. But haven't the Supreme Court told us several times that those are not the things we can rely on in rejecting qualified immunity? I believe when the Supreme Court has said that, Your Honor, it has been in the Fourth Amendment context, because qualified immunity applies differently in the Eighth Amendment context than it does in the Fourth. Of course, in the Fourth Amendment context, it's difficult for an officer in the field to know, in a split second, what might be deemed objectively reasonable. We need a case directly on point. But Your Honor is familiar with Hope v. Pelzer, which is an Eighth Amendment case, which says we don't always need a case directly on point if it is obvious that this is a violation. What is unreasonable under the Fourth Amendment is not sadistic under the Eighth Amendment, is it? They are not the same, but they're also not mutually exclusive, Your Honor. But what's your case indicating that this was sadistic? Well, I think that is an issue of fact to be decided by the jury, Your Honor. I would also say that this court decided in Hughes, and I believe Your Honor authored the opinion in Hughes, in a similar case where there was an escaped convict on the lam who was captured and then ultimately put into handcuffs. And there was a use of force that was alleged to have begun before the handcuffing and after the handcuffing. And in Hughes, a case cited by these defendants and authored by Your Honor, in Hughes, the court decided that summary judgment was not proper because after the handcuffs had been applied, the use of force to a handcuffed individual violated Hudson, which clearly established that beating a restrained inmate was a violation of the Eighth Amendment. Now here, that was, in Hudson, that's a small level of force. In Hughes, it was a small level of force. In fact, I believe Hudson went to the high court just on the issue of whether a trivial injury could even sustain an Eighth Amendment violation. Here, we have no such trivial injury, and the force used was not minor. It was deadly force. Therefore, if this low-level force that was used in Hudson or that was used in Hughes is not appropriate for disposition of summary judgment, then neither should this. If the court has more questions, I'll take them now, or I'll reserve what small time I have left. We'll give you some additional time for your rebuttal, counsel. Thank you, Your Honor. And I believe, counsel, for the defendants are dividing their time. Mr. Henkels, you're going first, and you have ten minutes, and that will be the number on the clock. So that will be your time, and Ms. Day, will it? Ms. Day? You'll have five minutes, and that will be your number on the clock. Thank you, Your Honor. And whenever you're ready, counsel. Counsel? May it please the court. My name is Robert Henkels, and I am appearing today on behalf of Sergeant DeMichael Dues. And the district court in this case properly granted summary judgment, and that decision should be affirmed for two reasons. The first is it's undisputed here and obvious that the circumstances were extreme and, you know, terrifying to those that were around. And, you know, given these circumstances, Sergeant Dues used proportionate and lawful force and a good faith effort. Mr. Henkels, do you agree with your friend, Mr. Schweiger, that when King was on the floor, as soon as he was on the floor, he had leg shackles on? I do not know, Your Honor, whether or not he had leg shackles on at that point. Sergeant Dues was on the front. The handcuffs took several minutes. I believe the — I think Mr. Schweiger said two minutes. After two minutes on the ground, he had both leg shackles and handcuffs on. And the handcuffs were his hands cuffed behind him, not in front of him. Correct? No, Your Honor. The handcuffs were in front of him. In front of him. Okay, so the handcuffs — he's handcuffed and he has leg shackles on within two minutes of hitting the ground. And the officer stays on his back for another seven minutes? Well, Your Honor, first, Officer Tran, who was the one who testified regarding the two minutes, I think he clarified it as — You have to get closer to the microphone. Sorry, Your Honor. I believe Officer Tran clarified it as three minutes. But as he was not on top of Travis King after King had escaped into the hallway, the evidence is universal here that he had his legs to the side with one arm on his back to kind of keep him in place. There were still nurses and doctors that were around that were terrified, and it was their obligation to provide him care. And it was Sergeant Duge's obligation to protect them while they do so. In this case, as Your Honors have pointed out earlier, the nurses felt so unsafe during this time that they made the independent decision. But that's the nurses. But how does your client's testimony that he never felt the imminent threat, and quoting from your client's testimony from King, affect our assessment of the proportionality of your client's actions? Your Honor, that is not correct. Hold on one second. It is not correct that Sergeant Duge never felt any threat. The evidence, as he testified at deposition, at — he testified at the initial stage, right, you know, in the room when Travis King was acting aggressively and violently, and after Sergeant Duge was thrown back against the wall, hitting his head and causing a concussion, and when he's sitting there and he saw Travis King run out that door, at that moment when he's getting up to assess the situation, he testifies at his deposition consistently with his declaration. He testifies, because this is a deadly force incident, I ran down the checklist in my brain, and as I'm fighting for my life and the life of everybody in that hospital, I considered policy and I also considered Mr. King's safety, even so over my own safety. This is the initial part of the struggle when he's able to meet up with Travis King. You know, the evidence here is consistent, right, as, you know, one witness testifies, and it's consistent with the declaration, right, that Travis King is fighting him aggressively. He is resisting and lifting the officers up above him and lifting everybody up, trying to bring him down. You know, Angela Krim describes him as a bronching bull, as 6ER-1217-1220. So during this time is a different stage, obviously, in the struggle, right? Once he's able to kind of get a grip down, then correct. Then this is no longer a situation where Sergeant Dews is fighting for his life, but he is fighting to protect the doctors and nurses who are there to provide him care in a public hospital, right? You know, he knows that Dr. Dittmar is prescribing a medication for King, based upon which Dr. Dittmar does for his, you know, based upon his assessment of the situation, based upon the continual thrashing around, and Sergeant Dews knows that's coming and he has to at least provide some pressure. And I would, at this point, like to address one of the questions Your Honors asked about whether or not there's independent evidence beyond just the declaration that he's easing up. And there is. At 4ER-810, Nurse Tays, who again, Nurse Tays is the individual who administered the medication, the Haldol. Nurse Tays testifies, obviously at the beginning, you know, the officers were struggling, but as it came under control, they eased up their efforts. This is also consistent, again, with Security Officer Standridge, who was assisting with one of the arms with Mr. King. He testified, again, that by the time he got there, which was about midway through the struggle, he was looking at Sergeant Dews, who was canceled up back on his own legs, putting his weight on his knees, with just a little bit of pressure on the back. Security Officer Standridge is not able to identify, does not see Sergeant Dews, but any weight on the upper back at all. Counsel, why don't you turn to, with some of the time you have left, as to the second prong of qualified immunity. Yes, Your Honor. And real quick, to address that, I would like to direct the Court. Both the appellants in this case cited Lombardo v. City of St. Louis, the Supreme Court case, and relied heavily on that in their opening brief. That is a Fourth Amendment case. But there is a recent development that just occurred. The Supreme Court, in that case, had remanded their decision on the Fourth Amendment, for the use of force, to have the Eighth Circuit develop a more factual record. As we point out, the Eighth Circuit decided to address a second prong and said, again, under the Fourth Amendment. And that court distinguished all the circuit court precedent, including Drummond, which was discussed by Appellant Counsel, and found, based upon its review, that there was no clearly established right under the Fourth Amendment against the use of prone restraint on resisting arrestee. Do you think we should apply a Fourth Amendment analysis here? I'm sorry, Your Honor. Absolutely not. As the Court in Hughes pointed out, the Eighth Amendment standard is a much higher standard, where there is no Fourth Amendment violation, however. There also cannot be an Eighth Amendment violation. So, as in the Lombardo case, where there is no right against a clearly resisting inmate, that should hold here. And I think recently, just a few days ago, June 30, 2023, the Supreme Court has denied cert on that decision. As Hughes shows, and with respect to whether or not there is a robust case law showing the constitutionality of Sergeant Dues' action, whether a reasonable official in that position could have known, there is no such law. As I think Hughes was discussed earlier, Hughes' are drastically different facts here. Hughes, there is positive, assertive evidence that the officers, after fully subduing this individual, after placing him in handcuffs behind his back, after he is left alone and he is saying he is no longer resisting at all, they are still punching him, they are still sticking a dog on him. Under this case, there is no evidence that Sergeant Dues used any force beyond that which was necessary to bring Travis King under control and to protect the nurses and doctors who were there to provide him care. His belief about that use of force was plausible, and under such circumstances, no reasonable trier of fact could find that any additional force was used, and under such circumstances, qualified immunity is appropriate. With that, Your Honor, I ask that the lower court decision be affirmed. Thank you. Thank you. Ms. Day, whenever you're ready. Good morning, Judge Beah, Bennett, and Thomas. My name is Kelly Savage Day, and I represent the appellees and defendants John Tran and Calvin Nee. I'd like to start by saying there's no doubt that this is a tragic case. Mr. King suffered life-altering injuries. He's a relatively young man. I believe he's 44. But that doesn't mean that he's entitled to a remedy under the law against these defendants under these circumstances. The district court's decision should be affirmed on qualified immunity grounds because plaintiff did not and cannot establish that the officer's actions violated a clearly established law or that a reasonable officer in similar circumstances would have plainly known that the continued use of force in this instance was wrong. As the court recently noted in its year's decision, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. But as the Eighth Circuit noted on remand in the Lombardi v. City of St. Louis case, no opinion has addressed a situation where there's a continued use of restraints on a resisting inmate after he's placed in the prone position and he's handcuffed. And, of course, the facts in Lombardi were much different than those here. It was a Fourth Amendment case, but the inmate also had his hands behind his back. I think we need to remember the facts of this case and what actually happened. Mr. King ran out of a room. He was an inmate. He ran into a hallway. There were two officers who had weapons on them. He resisted their orders to stop. He was eventually taken down to the ground. There were 11 witnesses who corroborated what happened in this case. Ten of those are medical professionals. Mr. King refused to stop struggling, even after he was placed in handcuffs. And there is some dispute in the record. This was a chaotic situation. My client, Mr. Tran, was the one who placed the handcuffs on Mr. King. He did testify. He thought that it took a couple of minutes. Sergeant Dews believes that it was several minutes into the altercation, and then, of course, we have the video evidence. But even when the handcuffs were placed on Mr. King, his hands were in front, and he continued to push himself up and move side to side. It was entirely reasonable for these officers to continue their efforts to try and keep this prisoner from escaping or injuring himself, others in the hospital, or the officers themselves. For those reasons and for those stated by Mr. King. Is there a reasonable issue of fact as to whether Mr. King, by pushing himself up, was trying to breathe rather than trying to escape? Well, that's what plaintiff has suggested. Well? However, in this case... We have to look at the facts and like most favorable to the plaintiffs, do we not? Absolutely, Judge Bia, but in this instance, that is not the situation. We have no statements by plaintiffs saying stop or that he was hurting or that he couldn't breathe. We have 10 medical professionals. We have 9, I'm sorry, we have 8 nurses, a unit clerk, and a doctor who all believe that Mr. King was breathing and that he was not in any imminent danger. Even after the officers get up off Mr. King, there's a 2-minute lapse in the video, I'm sorry, it's 1 minute 58 seconds, where no healthcare professional actually goes over, rolls Mr. King over, or looks at him. There's no reasonable inference here that Mr. King wasn't breathing or he was in danger at any time while the officers still had weight on him. My clients are in a little bit of a different situation. Mr. Nee placed leg shackles on Mr. King and never placed any weight on any part of his body. Mr. Tran put cuffs on Mr. King, but he was at the side. He was never on the upper back or any portion of Mr. King's body. And there's evidence that even before the shot was administered, my client had asked the security guard, Officer Standbridge, if he would take over holding Mr. King's arms because he was still moving around. My client got up even before the shot is administered and Mr. King is still moving. Do you have any final thought, counsel? Qualified immunity is an important defense. We want officers to make decisions to protect the public. And if we take it away in an instance like this where we have 11 independent individuals, 10 of which are healthcare professionals, then we're going to have officers who decide not to step in who are going to let prisoners run out and potentially harm the public. All right. Thank you, counsel. Thank you. Counsel, we'll give you two minutes for rebuttal. Thank you, Your Honor. I will try not to speak too quickly. With regard to Ms. Savage-Day's statement that her client never was on any portion of Mr. King's body, the record is clear that Mr. Tran's own statement in his report was, he, quote, used his body weight on top of King, helping pin him to the ground. I placed my right knee on King's lower back shoulder. I placed my right knee and left knee on King's lower body. So certainly he was part of the fray. Regarding the idea that independent witnesses all corroborate the defendant's stories and that none of them expressed or had any concern regarding Mr. King's safety, that is also not true. Nurse Atkins' deposition said it didn't sound like he could breathe very well. Nurse Munsell said it appeared that his moans and groans decreased in volume and frequency and he was having trouble breathing. Nurse Bondurant testified that she told the guards to get off of him because he could not breathe. There were certainly many instances in the record that contradict the self-serving statements of these guards. With regards to the Hughes case that my colleague from the Attorney General's office mentioned, he says Hughes was different because there was positive, assertive evidence that there was still punching and sicking the dog on him after Hughes had been handcuffed. That, of course, is not actually the holding of Hughes. There was no evidence. But in Hughes, the body camera came off and another body camera wasn't actually recording what was happening in that direction, so it was left undecided and thus in dispute whether or not that occurred. There was no positive evidence to suggest that Hughes was still being beaten except his own statements to that effect. Here we have a case with a horrible injury and an absolutely profound level of force that was used. And we had motive from these guards to want to hurt Mr. King because they had been found in violation of their own internal policies. The nursing supervisor said they would be reported for it. They got angry at Mr. King and when he fled from the room for whatever reason, they acted maliciously and sadistically against him, and that was what caused this incident. All right. Thank you, counsel. Thank you. We thank counsel for their arguments, and the case just argued will be submitted. With that, we are concluded and adjourned for the day. Thank you.
judges: BEA, BENNETT, THOMAS